Filed 11/5/14  Burke v. Newegg Enterprises CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| HAFSA BURKE, | B251187 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC478327) |
| v. | |
| NEWEGG ENTERPRISES et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara Ann Meiers, Judge.  Affirmed.

Alvin L. Pittman and Christie E. Webb for Plaintiff and Appellant.

Lee Tran & Liang, Steven C. Gonzalez, and Kevin Bringuel for Defendants and Respondents.

**INTRODUCTION**

Plaintiff Hafsa Burke appeals from the entry of judgment following the trial court's grant of summary judgment in favor of her former employer. The trial court concluded Burke failed to establish any disputed issue of material fact sufficient to defeat summary judgment on her claims for retaliation in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code §12940 et seq.) and wrongful termination in violation of public policy. Burke also appeals the trial court's award of sanctions against her and her counsel for failure to attend a court-ordered mediation. We affirm.

**FACTUAL AND PROCEDURAL HISTORY**

A. *Burke's Employment and Allegations*

Burke was hired by defendants Newegg Enterprises LLC, Newegg, Inc., and Proforce Temporaries, Inc., dba Olympic Staffing Services (Olympic)[1] in July 2011 as a temporary employee assigned to help conduct an internal benefits audit of Newegg's personnel files. She was supervised throughout her employment at Newegg by Maling Huang, Director of Risk Management, Compensation and Benefits. Huang terminated Burke for insubordination on January 10, 2012.

Burke filed her complaint on February 3, 2012, alleging causes of action for retaliation under the FEHA and wrongful termination in violation of public policy. The gravamen of Burke's FEHA claim is that she was terminated in retaliation for her opposition on two occasions to what she "reasonably believed to be race discrimination" by Huang and Newegg. Burke's second cause of action for wrongful termination in violation of public policy mirrors her FEHA retaliation claim and additionally alleges that Burke was terminated for opposing an instance of insurance fraud that she uncovered during her employment with Newegg.

---

[1]     Newegg Enterprises LLC and Newegg, Inc. (collectively Newegg) do not dispute, for purposes of this appeal, that Burke was an employee of Newegg. Olympic was dismissed from the action pursuant to settlement and is not a party to this appeal.

2

The first incident on which Burke's retaliation claim is premised occurred on or around November 15, 2011, when Burke was handling the file of Ms. Murray, an African-American female manager in Tennessee.[2] Burke noticed that Ms. Murray had a "large number of children with different last names" and, according to Huang, Burke brought the issue to Huang's attention and suggested that they should ask Ms. Murray for proof of dependency. Huang then instructed Burke to telephone Ms. Murray to request that she provide birth certificates for her children.[3] Next, Burke states that she told Huang "that it would be racially discriminatory to ask a black family for birth certificates but not require the same of other employees, including the Chinese employees." Burke refused to carry out Huang's instruction because she felt it was racially discriminatory. Burke alleges that Huang then stated that "99% of the Tennessee workforce was black employees and that blacks in Tennessee were known to commit insurance fraud . . . by claiming coverage for children who are not theirs. . . ." According to Burke, Huang then said Burke was insubordinate and that Burke would not become a regular full-time employee if she did not cooperate and continued to "question[] authority."

In the second instance, on or about January 4, 2012, Burke discovered while auditing employee files that 10-15 former employees in Tennessee never were provided notice of their right to continued insurance coverage under COBRA following their termination. Burke raised this issue with Huang and claims that Huang directed her to "disregard the COBRA violations." Burke then complained to Huang that the "Tennessee workforce was almost entirely made up of Black employees, and that it was wrong for the Company to deprive them of their COBRA rights." According to Burke,

---

[2] The complaint alleges that this file came to light while Burke was "processing" it during open enrollment. In her declaration submitted in opposition to summary judgment, Burke states that the issue came up during open enrollment while she was "training benefits employees to enter information" on an insurance website.

[3] Newegg did not dispute, for the purposes of summary judgment, that Huang told Burke to seek proof of dependency from Ms. Murray.

3

Huang angrily responded that "the employees in Tennessee did not earn a lot of money so they could not afford COBRA." Huang further told Burke to "stop addressing the COBRA subject" and that she needed to "keep[] quiet and do[] as directed without question" if she wanted to keep her job. Burke contends that when she reviewed the files of the terminated employees, their insurance coverage had been terminated. Burke's only evidentiary support for this statement is her declaration. Burke does not claim knowledge of any other employee, other than Ms. Murray and the employees who did not receive their COBRA notices, being discriminated against in the manner she alleges, nor does she contend that she made any other complaints related to this issue.

As the basis for her second cause of action for wrongful termination in violation of public policy, Burke points to the two events discussed above, as well as a third incident, in which she claims she discovered and reported "what she reasonably believed was insurance fraud" by a Newegg executive named Kick Chong. The latter incident occurred on or about January 4, 2012, while Burke was auditing Mr. Chong's benefits file. Burke observed that Mr. Chong's prior 2011 insurance enrollment form listed a child named "Daniel" who was not listed on the 2012 form. The 2011 form also had a handwritten notation of "nephew" on it. When Burke contacted Mr. Chong to update his file, Mr. Chong stated that Daniel was not his son. Burke also contends that the file did not contain a Caregiver's Authorization Affidavit (reflecting that Mr. Chong was Daniel's custodian) or birth certificate for Daniel when she reviewed it. Burke notified Huang of the issue and stated that she believed it was insurance fraud. Huang then called Mr. Chong to follow up. After speaking with him in Chinese, Huang reported to Burke that "sometimes Chinese employees have their families visiting from China who stay with them for awhile and add them to the insurance." Huang also purportedly instructed Burke to "keep quiet about it because they wanted to protect Kick," who was a friend of Newegg's owner.

4

*B. Newegg's Motion for Summary Judgment*

Newegg moved for summary judgment or, in the alternative, summary adjudication, on April 5, 2013. Newegg argued that none of the alleged conduct by Burke constituted "protected activity" under FEHA, and thus could not support a prima facie case for retaliation. With respect to the dependency issue, Newegg offered evidence, undisputed by Burke, that Ms. Murray was never asked for any proof of dependency. Newegg also provided an undisputed statement by Huang that she instructed the benefits department, including Burke, that the policy moving forward would be that all newly hired employees would be required to provide verification for their dependents, but no current employees would be required to provide such proof.

On the issue of the missing COBRA notices, Newegg provided evidence that it investigated the failure to send out the notices to 10-15 terminated employees and discovered that the former employees did not receive the notices because they were still listed in Newegg's system as current employees. As a result, these employees had continued to receive insurance coverage from Newegg until Burke alerted Newegg to the problem.

In support of summary adjudication on Burke's second cause of action, Newegg argued that since there was no ongoing fraud to report (as Mr. Chong was not claiming Daniel as an active dependent at the time), Burke could not have reasonably believed she was objecting to such fraud. Newegg offered the following documents as evidence: a Caregiver's Authorization Affidavit dated in 2008 listing Mr. Chong's wife as Daniel's aunt, a Healthcare Enrollment Change form, also from 2008, adding Daniel as a beneficiary to Mr. Chong's insurance, and Daniel's birth certificate. Huang claimed that these documents were in the file when Burke showed it to her, but Burke denied seeing them. Newegg also provided documentary evidence, undisputed by Burke, that Burke accessed the online benefits database on January 3, 2012 and that at that time the benefits listing for Mr. Chong showed that Daniel had received benefits from January 2009 to January 1, 2012, but was currently "not active" and therefore not receiving benefits.

5

Newegg also argued that Burke's conduct toward Huang and her coworkers provided a legitimate, non-retaliatory business reason for her termination. Newegg provided evidence to support its claim that it legitimately terminated Burke for insubordination, including the declarations of Huang and several of Burke's coworkers. Huang stated that Burke was "often uncooperative" and that Huang received complaints from other employees that Burke was rude to them and to Huang. Chai Cai, Newegg's then-Senior Manager of Human Resources, stated that he had received complaints that employees were uncomfortable calling Burke because "she was rude to them or would even hang up on them," and that he spoke to Huang about these complaints and his concern with Burke's "unprofessional rudeness and loudness." Phillip Park, another Newegg benefits auditor, stated that Huang solicited his opinion regarding Burke prior to Burke's termination and mentioned that she had received complaints about Burke. Park's opinion was that Burke was "loud and distracting" and that her attitude "did not make for a positive work environment."

Huang further testified that, on January 5, 2012,[4] Burke "initially refused" a request from Huang to email an insurance carrier to check a policy term, but ultimately agreed to perform the task once Huang asked her "repeatedly." On January 10, 2012, Huang stated Burke "protested" during a meeting when Huang instructed the benefits team to perform a data entry project. After the meeting, according to Huang, Burke stated that if Huang "did not like it, then I should terminate her."[5] Huang asked Burke to meet with her in the conference room. According to Huang, "although I was discouraged and unhappy with plaintiff's insubordination and I was concerned that her position would demotivate other employees from pitching in for this project, I still intended only to give

---

[4]     Huang's declaration lists this date as January 5, 2011. However, given that Burke was hired in July 2011 and terminated on January 10, 2012, we presume that this was a typographical error and that the incident occurred on January 5, 2012.

[5]     Employee Yolande Hill submitted a declaration recalling that Burke said "what are you going to do, fire me?"

[Burke] a warning." However, when she met with Burke, Burke said "Why? Are you going to terminate me?" in a voice Huang "perceived as challenging." Huang contends that based on Burke's "negative effect on team morale," and her "latest act of insubordination," she decided to terminate Burke because, "in my judgment, it would be better for my Benefits team and for Newegg to work with someone who would be less divisive."

### C. Burke's Opposition to Summary Judgment

In opposition to Newegg's motion, Burke argued that, even if no actual discrimination or insurance fraud took place, her opposition to what she reasonably believed to be improper conduct by Huang and Newegg constituted "protected activity" under FEHA and her termination based on her complaints was therefore actionable. In support of her claim that Newegg's justification for terminating her was pretextual, Burke provided evidence that her work was well-received by Newegg and that she was terminated after she began to complain. For example, Burke contended that she was told by Huang that she was doing a "great job" and that Burke was tasked with providing training for the benefits department, in addition to her auditing responsibilities. In September 2011, a permanent position as a "Benefits Specialist" opened up. Burke alleged in her complaint that she was then moved into that position, but she testified in her deposition that Huang told her she could fill that position after "the usual six month[] period." She was again commended by Huang in October 2011 and given a pay increase.

With respect to the events surrounding her termination, Burke did not expressly deny any of the events or statements provided in Newegg's evidence in support of summary judgment. Instead, she offered several conclusory sentences in her declaration on the topic. For example, as to the day of her termination, Burke does not directly address Huang's version of the team meeting or the comments Huang claims Burke made. Burke simply states that "without any further incident or triggering event" she was called to meet with Huang, and that Huang told her "this is a firing due to your insubordination." Burke also testified that she asked Huang exactly what she meant by

insubordination, and Huang told her "I [Burke] don't listen. I don't do what I'm directed to do. I question authority." Burke also declares that she "committed no act, nor engaged in any conduct, for which discipline would have been warranted." She also states that she never "refused to follow an instruction or request by Huang to call an insurance carrier and check a policy term" and never "refused to perform any data entry that I was asked to perform."

### D. Trial Court's Ruling on Summary Judgment

In an order filed July 3, 2013, the trial court granted summary judgment in favor of Newegg, finding that "there is no material issue of fact which would preclude a judgment for the Newegg defendants as a matter of law." The court concluded as to both Burke's FEHA claim for retaliation and the common law claim for wrongful termination in violation of public policy that Newegg had proffered a legitimate business reason for Burke's termination and Burke had failed to provide sufficient evidence that Newegg's purported reason was pretextual.

On July 11, 2013, the trial court issued its order ruling on Newegg's evidentiary objections to Burke's evidence on summary judgment. Burke also appeals the order sustaining several of these objections.

### E. Motions for Sanctions

On March 15, 2013, Olympic moved for sanctions against Burke and her counsel, for their failure to appear for court-ordered mediation on March 4, 2013.

As Olympic explained, at a hearing on January 28, 2013, with Burke's counsel present, the trial court ordered the parties to participate in ADR mediation and set a mediation completion date of April 16, 2013. The same day, counsel for all parties signed up for a court-appointed mediator with the court's ADR office. While the parties discussed the potential alternative of private mediation, they never reached an agreement on the issue. On February 7, 2013, the court served a Notice of Assignment of Mediator, assigning Jeffrey Dasteel as the mediator and ordering mediation to be completed by March 13, 2013. The notice further stated that if the mediator had not contacted the

8

parties within ten days, plaintiff's counsel must contact the mediator to set up the mediation. The mediator served his notice on February 20, 2013, setting the mediation for March 4, 2013. The proof of service on the notice indicates that it was served on the parties—including plaintiff's counsel—by mail, fax, and email. Burke and her counsel did not appear for the mediation on March 4, 2013. Olympic therefore requested sanctions of $4,660 for the time spent preparing for and attending the mediation and preparing the sanctions motion.

Newegg also filed a motion for sanctions, joining Olympic's argument and for its part requesting $3,500 in sanctions. Defendants' motions were made pursuant to California Rules of Court, rule 3.894, and Los Angeles Superior Court Local Rules, rule 3.272, which require all parties and attorneys of record to attend all mediation sessions in person, as well as California Rules of Court, rule 2.30(b), and Los Angeles Superior Court Local Rules, rule 3.10, which authorize sanctions for failure to comply with the court's rules without good cause.

Burke opposed the sanctions motions, claiming that she and her counsel did not attend the mediation because they never received notice of the date. Burke's counsel, Alvin Pittman, stated that he had been in trial out of state since February 7, 2013, and had engaged two attorneys during that time to monitor his cases and messages. All three attorneys provided declarations that they had not received the notice from the mediator setting the mediation date, and that they had kept track of incoming mail and messages during that time. They also claimed that the mediator told them over the phone that he had served the notice by email, but that no such email was received at any of the relevant email addresses.

In an order filed April 19, 2013, the trial court granted defendants' sanctions motions, awarding $3,500 and $4,660 to Newegg and Olympic, respectively, against plaintiff and her counsel jointly and severally. The court found that plaintiff's counsel "has not provided a sufficient explanation as to how [he] did not receive the Notice by fax, email and/or mail when counsel for both defendants received the Notice." Further,

9

the court held that plaintiff's counsel violated his "specific obligation to contact the mediator immediately to schedule a mediation date" if counsel had not been contacted by the mediator within ten days of service of the court's Notice of Assignment, as well as his "broader duty to the court to arrange and ensure that mediation took place by the ordered completion deadline." However, the court noted that the cost of preparing defendants' mediation briefs would be deducted from the sanctions award if Burke set up and the parties completed mediation within 30 days.

The trial court entered judgment for Newegg on July 3, 2013. Burke timely appealed.

## DISCUSSION

### A. *Motion for Summary Judgment*

#### 1. *Standard of review*

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 849, fn. omitted (*Aguilar*).) "Once the [movant] . . . has met that burden, the burden shifts to the [other party] . . . to show that a triable issue of one or more material facts exists as to that cause of action. . . ." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, at p. 849.) The party opposing summary judgment "may not rely upon the mere allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, at p. 850.)

We review the trial court's grant of summary judgment de novo and decide independently whether the parties have met their respective burdens and whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of

10

law.  (Code Civ. Proc., § 437c, subd. (c); *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348; *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).)

### 2. First Cause of Action for Retaliation

#### a.  Governing Legal Principles

The FEHA makes it an unlawful employment practice for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part. . . ."  (Gov. Code, §12940, subd. (h).) Claims for retaliation under the FEHA are subject to the three-stage burden-shifting test set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.  (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)  The initial burden falls on plaintiff to set forth a prima facie case for retaliation.  A plaintiff meets this burden by showing (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action.  (*Ibid.*)  Upon such a showing, the burden shifts to the employer to provide substantial responsive evidence showing a legitimate, non-retaliatory reason for the adverse employment action.  (*Ibid.*; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 149.)  If the employer produces a legitimate reason, the presumption of retaliation "'drops out of the picture,'" and the burden shifts back to the employee to prove intentional retaliation.  (*Yanowitz*, *supra,* 36 Cal.4th at p. 1042.)  The plaintiff must produce "'substantial responsive evidence' that the employer's showing was untrue or pretextual."  (*Martin v. Lockheed Missiles & Space Co*. (1994) 29 Cal.App.4th 1718, 1735; *Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1156.)  "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory."  (*Guz, supra*, 24 Cal.4th at p. 361.)

11

### b. Prima Facie Case of Retaliation

As an initial matter, Newegg does not dispute that an employee's actions may constitute protected activity when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA. It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even if the conduct is not actually prohibited by the FEHA. (See, e.g., *Yanowitz*, *supra*, 36 Cal.4th at p. 1043; *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 473.) Here, Burke contends that she had a reasonable and good faith belief that in both alleged instances, the conduct she opposed was racially discriminatory, and therefore she engaged in protected activity under the FEHA. Based on the circumstances of each incident, we disagree.

For the first instance of her opposition to discriminatory conduct, Burke points to her refusal to contact Ms. Murray, the Tennessee manager, for proof of dependency for her children. To show that she had a reasonable belief that Huang's instruction to seek birth certificates from Ms. Murray was racially discriminatory, Burke relies on two key pieces of evidence: (1) the fact that Huang ordered her to seek proof of dependency from an African-American employee and did not require the same proof from Chinese-American employees (since, according to Burke, the latter employees also often had children with different surnames); and (2) the discriminatory statement she claims Huang made that "blacks in Tennessee" often committed insurance fraud. But upon close examination, even taking Burke's version of events as true for the purposes of summary judgment, neither fact can support Burke's claim that *at the time* she refused to contact Ms. Murray and accused Huang of racial discrimination, she had a reasonable basis to believe that discriminatory conduct had occurred.

The problem with Burke's claim that Newegg (via Huang) was treating African-American employees differently than other employees is that the only evidence Burke introduces to support this allegation — her discovery that there was no birth certificate in

12

Mr. Chong's file for a dependent with a different surname (and her attendant belief that no one would ask Mr. Chong for such proof)—happened after her dispute with Huang over Ms. Murray. In both her deposition and her declaration, Burke confirmed that Huang's order to contact Ms. Murray, and Burke's refusal to do so, occurred in November 2011, while her review of Mr. Chong's file occurred in January 2012. And Burke has provided no other evidence to suggest that, as of November 2011, she had any basis to believe that African-American and Chinese-American employees were being treated differently by Newegg or Huang regarding proof of dependency. Nor, for that matter, has she claimed that she was aware of any other African-American employee who was subject to this same demand; rather, she points only to the single incident regarding Ms. Murray. As noted above, while Burke does not need to establish that actual discrimination occurred in order for her conduct to be protected under the FEHA, the lack of any other evidence of discrimination undercuts the reasonableness of Burke's belief that discrimination was occurring.

Burke also cannot rely on Huang's purported discriminatory statements to establish the reasonableness of her belief that Huang was discriminating against Ms. Murray. Based on the sequence of events set forth in Burke's own declaration, Huang did not make any statements involving race until *after* Burke had told Huang that she would not contact Ms. Murray because it would be racially discriminatory to do so. Thus, Burke's belief at the time she refused Huang's instruction could not have been based on a statement that Huang had not yet made. Moreover, as the trial court noted, it was Burke who first brought the Murray file to Huang's attention and suggested that some follow-up might be needed because Ms. Murray had a number of children with different surnames. Thus, Burke cannot contend that it was Huang's singling out the Murray file for follow-up that raised an inference of discrimination.

On appeal, Burke argues that the trial court erroneously credited Huang's testimony that Burke initiated discussion of the Murray file as undisputed, when it was really a credibility question between Huang and Burke that should be left for the jury.

13

But Burke concedes that she "never testified" in her declaration or at her deposition as to whether she first brought up the Murray file and notes that Huang was the only witness on this point. As such, there is no competing testimony for the trial court (or for this court in its de novo review) to weigh. The only evidence before the court is Huang's declaration stating that Burke brought her the Murray file and suggested they call her to ask for proof of dependency. Burke did not provide any evidence to dispute this fact and it is entirely inconsistent with her claim that she believed at the time that Huang wanted proof of dependency from Ms. Murray because of Ms. Murray's race.

The second instance of discriminatory conduct Burke alleges was Newegg's failure to provide about a dozen terminated employees with COBRA notices. Burke claims that she reasonably believed Newegg and Huang were discriminating against African-American employees because of their race by depriving them of "important insurance and healthcare rights" contained in the COBRA notices. As evidence that her belief was reasonable and held in good faith, Burke points to the fact that the affected employees were all African-American, that Huang told Burke to "disregard" the issue and then made racist statements regarding those employees, and that Burke believed at the time (based on her investigation of the files) that the terminated employees had lost their insurance coverage.

As with the prior incident, the totality of the evidence does not support an inference that Burke reasonably could have believed discrimination was occurring at the time she complained. First, Burke points out that "99%" of the Newegg employees in Tennessee were African-American and does not dispute that only a handful of terminated employees were affected by the COBRA notice issue. Thus, she cannot dispute that the majority of former African-American employees were not discriminated against in the manner she claims. It is also unsurprising, given the demographic makeup of Newegg's employees in Tennessee, that the affected employees were African-American. Second, as with the dependency issue, Burke's own version of events establishes that any racist comments allegedly made by Huang regarding these employees were made *after* Burke

14

complained; thus, Burke's complaint could not have been based on those comments. Moreover, Burke has no evidence to suggest that Huang was involved in Newegg's failure to send out COBRA notices. In contrast, Newegg provided declarations stating that the COBRA notices were not sent out due to an error made by a manager in Tennessee, that the error occurred because the employees were still listed as active in the database (and therefore were still receiving insurance coverage from Newegg), and that the error was corrected once Burke notified Newegg of the issue. As this evidence also reveals, even assuming Huang told Burke not to do anything about the COBRA notice issue , it is undisputed that Huang followed-up with the Tennessee office using the information provided by Burke and that the notice issue thereafter was investigated and resolved. Burke conclusorily states that her "audit" of the affected employees' files "showed that insurance coverage was terminated" for those employees. This statement may be relevant to whether Burke believed the employees had been adversely affected at the time, but, without more, it cannot support Burke's claim that she therefore reasonably concluded that the notices were withheld discriminatorily, for all the reasons discussed above. Moreover, Newegg's uncontradicted evidence that the terminated employees were in fact not deprived of coverage and that Burke's discovery actually fixed an error that was costing the company money (the issue Burke was hired to audit in the first place) eliminates any inference that Newegg was discriminating against these employees or that Huang would have been angry with Burke for pointing out the problem.

Finally, Burke argues that the trial court improperly made "judgments about how Ms. Burke behaved" and how she should have behaved under the circumstances, and therefore improperly weighed evidence in favor of Newegg. Because our review is de novo, we independently review the record and assess whether Burke has met her burden to raise a triable issue of fact. For the reasons discussed above, we conclude that she has not.[6]

---

[6]     Because we find that Burke has not provided sufficient evidence to establish a prima facie case of retaliation, we need not reach Newegg's argument that Burke's

## c. *Pretext*

Even if Burke had met her initial burden to establish a prima facie case of retaliation under the FEHA, we further conclude that Burke has failed to offer sufficient evidence to "permit a rational inference that the employer's actual motive was discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361.) Burke does not dispute that Newegg met its burden on summary judgment to set forth a nonretaliatory reason for its decision to terminate her. Instead, she argues that the claim of "insubordination" was pretextual and that Newegg's actual motive was in retaliation for her opposition to Newegg's discriminatory conduct. A plaintiff may establish pretext "'either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' [Citations.]" (*Morgan v. Regents of the University of California* (2001) 88 Cal.App.4th 52, 68-69.) To avoid summary judgment, however, the plaintiff must produce specific and substantial evidence of pretext. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807.)

Here, Burke's primary evidence of pretext is the timing of her termination. Specifically, Burke points to the undisputed evidence that her work was initially praised and she was given a raise in October 2011 then, a month later, she made her first complaint regarding Huang related to the proof of dependency issue. On January 4, 2012, Burke complained to Huang regarding the issues with Mr. Chong and the COBRA notices. Burke was terminated on January 10, 2012. This evidence, Burke argues, raises the inference that her termination was in retaliation for her purportedly protected conduct.

However, while a plaintiff may make a prima facie showing of a causal link "by producing evidence of nothing more than the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision," such evidence "only satisfies the

___

complaints were not "protected activity" under the FEHA because the alleged targets of the discrimination were located outside of California.

16

plaintiff's initial burden." (*McRae v. Department of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377, 388.) "[T]emporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, [nonretaliatory] reason for the termination. [Citations.]" (*Arteaga v. Brink's, Inc*. (2008) 163 Cal.App.4th 327, 353; see also *McRae v. Department of Corrections and Rehabilitation, supra*, 142 Cal.App.4th at pp. 388-389 [temporal proximity standing alone is insufficient to show pretext]. "Instead, an employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual." (*Loggins v. Kaiser Permanente Internat*. (2007) 151 Cal.App.4th 1102, 1113 (*Loggins*).)

Here, Burke fails to provide the requisite "substantial additional evidence" to support her claim of pretext. (*Loggins*, *supra*, 151 Cal.App.4th at p. 1113.) Crucially, Burke does not dispute the facts on which Newegg claims it based its legitimate decision to terminate her for insubordination. Specifically, Newegg provided statements by Huang and by Burke's coworkers that Burke was rude, disruptive to her team, and resisted orders by Huang, her supervisor, on several occasions. Furthermore, Huang stated that she ultimately based her decision to terminate Burke on Burke's conduct that day—first "protest[ing]" an instruction by Huang to perform data entry with the rest of the benefits team during a team meeting and then "challenging" Huang that if she "did not like it, then [Huang] should terminate her." Instead of directly disputing this evidence, Burke provided general statements in her declaration that she "committed no act, nor engaged in any conduct, for which discipline would have been warranted," and that she never "refused" to perform a task as instructed by Huang. However, as Newegg points out, it did not contend that Burke absolutely refused to perform certain tasks, but rather that she protested and resisted doing so, and had to be asked several times by

17

Huang.[7]  As such, the facts supporting Newegg's claim that Burke was insubordinate remain largely undisputed.  Thus, Burke's suggestion that a termination for "insubordination" should automatically be viewed with suspicion is inapposite here, where Newegg's claim of insubordination is based on specific, undisputed facts.  By contrast, in *Wrighten v. Metropolitan Hospitals, Inc*. (9th Cir. 1984) 726 F.2d 1346, 1357, cited by Burke, the Ninth Circuit discounted a statement of "general insubordination" as a basis for termination, where the only potentially insubordinate conduct was simply the plaintiff performing her job.

Burke also argues that Huang's alleged racially discriminatory statements should be considered as circumstantial evidence of discriminatory motive.  While Burke is correct that relevant discriminatory remarks, even if potentially "stray," may be considered along with all of the other evidence to determine whether a rational inference of discrimination exists (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 541), this does not help Burke.  Evidence of Huang's racially discriminatory remarks might be relevant circumstantial evidence of discriminatory motive, except that Burke does not contend that she was terminated because of her race.  Instead, Burke claims she was terminated in retaliation for her complaints about Huang's discriminatory treatment of others.  Thus, Huang's remarks cannot be used to infer a discriminatory motive toward Burke.[8]

Accordingly, even if Burke could establish a prima facie showing of retaliation, she did not offer "specific, substantial evidence" to support her claim that Newegg's proffered reason for its termination decision was pretext for unlawful retaliation.  (*Horn*

---

[7]    Burke argues that Newegg has offered "shifting" explanations for her termination based on the same evidence.  There is no evidence of this in the record.  Huang stated that Burke "initially refused" to check a term, but then ultimately agreed once Huang asked her several times.

[8]    Burke also suggests that if there is evidence of a mixed motive for her termination, the jury must be allowed to decide whether her protected conduct was a "substantial motivating factor."  (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203.)  This issue was not raised in the trial court and we therefore do not consider it.

*v. Cushman & Wakefield Western, Inc.*, *supra*, 72 Cal.App.4th at p. 807.)  Because Burke failed to provide sufficient evidence to "permit a rational inference that the employer's actual motive was discriminatory," Newegg was entitled to summary adjudication on Burke's first cause of action for retaliation.  (*Guz*, *supra*, 24 Cal.4th at p. 361.)

       *3.  Second Cause of Action for Wrongful Termination in Violation of Public Policy*

       *a.  Governing Legal Principles*

In her second cause of action for wrongful termination in violation of public policy, Burke alleged that Newegg discharged her in retaliation for her complaints about Newegg's racially discriminatory conduct and for her discovery of potential insurance fraud by a Newegg executive.  To analyze a tortious discharge claim, we apply the same burden-shifting framework as with Burke's FEHA claim.  (*Loggins, supra*, 151 Cal.App.4th at pp. 1108-1109; *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453.)

       *b.  Prima Facie Case of Wrongful Termination*

Burke's common law termination claim is based, in part, on the same facts and allegations that support her FEHA claim.  To that extent, this claim fails for the same reasons detailed above.  Burke also alleged one additional incident on which she claims her termination was wrongfully based—her report to Huang that Mr. Chong's file revealed potential insurance fraud because he had claimed as a dependent a child who was not his son.  As with her FEHA claim, Burke does not challenge Newegg's showing that there was no actual fraud.  Daniel was not actively being covered by insurance as of January 2012 and the requisite forms documenting the relationship were (at some point) placed in the Chong file.  Instead, Burke contends that she had a reasonable belief that insurance fraud was occurring when she complained about it to Huang.

In support of her belief, Burke points to her statements in her declaration that Daniel was listed on Mr. Chong's 2011 form as a dependent but not on the 2012 form, that there was no birth certificate or Caregiver's Authorization Affidavit in the file when

19

she reviewed it, that when she called Mr. Chong to clear up the discrepancy he stated that Daniel was not his son, and that when she reported this information to Huang, Huang told her to keep quiet about it. When viewed in context with the additional details of this incident, particularly Burke's own deposition testimony, Burke's evidence is insufficient to establish that she had a reasonable belief that she was reporting insurance fraud to Newegg.

While Burke claims (without documentary support) that Mr. Chong's 2011 enrollment form listed Daniel as his "son," she also admits that the form had a handwritten notation of "nephew" on it. Her conversations with Mr. Chong and Huang then gave her the explanation that the file—which Burke claims did not contain any documentary support showing Mr. Chong's guardianship of his nephew—did not. Mr. Chong told Burke that Daniel was not his son and Huang provided the further explanation, after speaking with Mr. Chong, that "sometimes Chinese families have their families visiting from China who stay with them for awhile and add them to the insurance." Thus, Burke knew at that time that Mr. Chong was not currently claiming Daniel as his son, and was not actively seeking insurance coverage for him—Daniel was not included on the 2012 enrollment form and Burke herself had accessed the insurance database where Daniel was listed as "not active." Armed with this information, it is unsurprising that Burke admits she did no further investigation. In sum, the undisputed evidence does not provide any basis for Burke to claim she reasonably believed Mr. Chong was committing insurance fraud.[9] Burke therefore cannot meet her burden to establish a prima facie case of wrongful termination in violation of public policy.

---

[9] As a result, we need not reach Newegg's contention that Burke's tortious discharge claim fails for the additional reason that it is not based on an appropriate public policy.

### 4. Evidentiary Objections

Burke also challenges the trial court's ruling sustaining four of Newegg's objections to her evidence (objections 4, 8, 9, and 17) submitted in connection with her opposition to summary judgment. We find none of this evidence material to our determination that Burke did not establish a prima facie case of retaliation or wrongful termination, and therefore conclude the issue is moot.

### B. Mediation Sanctions

Burke argues that the trial court erred in awarding sanctions to Newegg because Burke demonstrated good cause for her failure to attend the mediation. We review the trial court's order awarding sanctions for abuse of discretion. (*Ellerbee v. County of Los Angeles* (2010) 187 Cal.App.4th 1206, 1217 [citing *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1364].) We reverse "'only if the trial court's action was "'"arbitrary, capricious, or whimsical."'" [Citations.]'" (*Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 878.) Under this standard, Burke cannot meet her burden to affirmatively demonstrate error in the trial court's ruling.

Burke contends that the trial court "disregarded" evidence of good cause for her failure to appear at the mediation. On the contrary, the trial court expressly considered Burke's evidence supporting her counsel's claim that he never received notice of the mediation, and found that this evidence did not "provide a sufficient explanation" as to the discrepancy, given that the other parties received the notice. Notably, Burke does not contend that the mailing address or fax number listed on the proof of service for the mediation notice were incorrect.[10] Moreover, even assuming that Burke did not receive notice of the mediation, Burke does not deny receipt of the trial court's Notice of Assignment of Mediator, served on February 7, 2013, which ordered Burke to take action if she had not heard from the mediator within ten days and further required the mediation to be completed by March 13, 2013. Burke contends that her attorneys only learned of

---

[10] The proof of service did not list an email address for plaintiff's counsel.

21

the mediation upon receipt of Olympic's motion for sanctions on or about March 19, 2013. At that point, the March 13 mediation deadline set by the court had already passed and Burke's counsel had taken no steps to determine the status of the mediation or to facilitate its completion. Thus, regardless of whether Burke received the mediator's notice, it was not an abuse of discretion for the trial court to conclude that Burke's failure to arrange and ensure that mediation took place was the true cause of her failure to appear for mediation, and therefore that sanctions were warranted.

Burke also suggests that the trial court abused its discretion by providing a mechanism for Burke to seek to reduce the sanctions amount. In the sanctions order, the trial court noted that if Burke was able to set up an ADR mediation or set up and pay for private mediation within thirty days, "the costs of preparation of defendants' mediation briefs will be subtracted from the above sanctions awards, upon ex parte application by plaintiff's counsel." Burke appears to argue that by requiring Burke to move ex parte to reduce the award the trial court improperly "impos[ed] extra procedural steps." Burke cites to *Bergman v. Rifkind & Sterling, Inc.* (1991) 227 Cal.App.3d 1380, but this case is inapposite. *Bergman* involved reversal of a sanctions order because the trial court made findings and a decision to impose sanctions without prior notice to the affected party. (*Id*. at p. 1387.) Here, the trial court ordered sanctions following a fully briefed motion and hearing. Burke's suggestion that the trial court's order violated due process is therefore without merit.[11]

---

[11]     Burke does not otherwise challenge the amount of sanctions awarded.

22

## DISPOSITION

The judgment and order awarding sanctions are affirmed.  Costs on appeal are awarded to Newegg.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur


WILLHITE, Acting P. J.


MANELLA, J.